Good morning. Before we hear our one case this morning, we have a motion. Yes, Mr. Glenn. It is my pleasure to introduce to the court one of my distinguished law clerks who has served the interests of this court and my chambers with great distinction over the past 18 months. On that, I formally move the admission of Rajiv Gupta, who is a member of the Bar and Good Standing of the highest court of Virginia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Thank you, Judge Lynn. Your motion is granted. Would you please face the clerk and raise your right hand. Mr. Gupta. You solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Welcome to the Bar of the U.S. Supreme Court of the Federal Circuit. Thank you. And on behalf of the judges of the court, I also would like to welcome you to the Bar and to say we look forward to seeing you back here with regularity. At social functions only. You're welcome. Thank you. The case this morning is 0610871134, Nichols Institute, Diagnostics Police Antibodies Clinical Labs. Mr. Doyle. Good morning, Your Honors. May it please the court. This appeal involves a cascade of errors committed by the district court involving claim construction, infringement, anticipation, test mode, enablement, written description. All of those are before the court this morning. I want to start with claim construction. First, I wanted to point out that each of those errors is reviewed de novo by this court. Each of those errors requires reversal of the judgment against scantibodies, and correction of each of those errors results in judgment being entered in favor of scantibodies. Claim construction. The first error in claim construction involves the term antibody. The claim construction by the district court was a prefilled claim construction. The district court bases claim construction of antibody solely on a dictionary definition. The district court disregarded the specification of the patent. Well, first let me point out, and I know Your Honors know this far better than I, but you made clear, if it wasn't clear before, in Phillips, that the specification must be considered. That the context of the description of the invention in the specification... How do you know he didn't consider it? Well, first, of course, I was there, and I argued it over and over again, that the specification specifically says that the invention here is a group of peptides, and that group of peptides serving as the immunogenic source of assays and antibodies. And this specification could not be clearer that the antibodies that are claimed in Claim 17 and Claim 21, the only claims found to be infringed, the antibodies, their source is the peptides of the invention. The specification says over and over again, it's the peptides of the invention, not the prior art. Scantibodies practices the prior art. But the claim is directed to the antibody, not the method by which it is prepared. Correct, and Your Honor, this is not a method limitation that I'm suggesting is there. This is completely consistent with this Court's cases, both pre-Phillips and post-Phillips. The most striking being the Nystrom v. Trex case. If the specification makes clear that the source of a composition or product claim is a particular material, such as, in Nystrom, wood cut from a log, was the board that was claimed. Here, it's not the source. It was a description of what was claimed. And here, the claim makes quite clear that it is directed to an antibody that has certain specified properties. And, I mean, that antibody, you will, I think, agree with me that the antibody can certainly be prepared using the peptides that are described and the technique that is described, but that's not the only way they can be prepared. This specification says it is the only way. This specification says that if you practice the other way, which was to use the whole immunogen, to use the 1 to 84 PTH molecule, that did not work. In column 2 of the patent, they describe that as a prior art, and they say that the disadvantages of this prior art are overcome, how? By the peptides serving as the immunogenic source. That's the invention. This is a classic case that I think your honors have been reacting to, in which what happened is they invented a particular invention involving these peptides, those peptides serving as the immunogenic source. And then they turn around, they get into the courthouse, and they start suing for infringement, and instead they're talking about the prior art method, which our client uses, which is to use the whole immunogen. What our client does is to immunogize with the whole peptide. That's what had been done before, as described in column 2 of the patent, and they said the peptides, using the peptides instead of the whole immunogen, allowed the drawbacks of those earlier approaches to be overcome. One of which was the expensive, expensive preparation that was needed if you used the whole immunogen, which is language right out of this court's Honeywell opinion, which just came down a few months ago. But if you used the whole immunogen and then purified that to obtain the antibody, wouldn't you wind up with the same antibody? As difficult as that process might have been, and as disadvantageous as it might have been perceived? No, your honor, the record could not be clearer. Each of the experts said you start with a different immunogen, you get a different set of antibodies. What you will result in is an antibody that can be used for the same ultimate purpose. But patents aren't about some broad, lofty purpose, as the district court thought. A patent is about what is specifically claimed. And here, you use a particular immunogen. That is the nature of an antibody. It is an antibody. It is anti to a particular immunogen. If you use a particular immunogen, you get a particular antibody. There are obviously permutations that can get you to the same result, but not the same antibody you get by using the peptides as opposed to 184. Let me take a moment, because I wanted to reserve five minutes if it's okay, if I can move to the second claim construction issue. I just want to briefly highlight, the district court did okay in defining what selectively binds is. But as we pointed out in our briefs, the claim construction error there is the district court didn't apply it. When it went through and made its JMOL rulings, when it instructed the jury, it allowed selectively binds to become binds. When it came to the evidence, which is undisputed, that the antibody that scantibodies creates by using 1 to 84 as its immunogen, that antibody selectively binds 1 to 84. It will also bind one of these peptides, the 1 to 9 peptide. But when you check the binding, when you do testing, and you test it, you get data, it shows that the scantibody's antibody prefers 1 to 84 eight times over 1 to 9. It is selective for 1 to 84, and you cannot eliminate the term selectively. Let me ask you to turn to the anticipation issue, if you would. It seems to me that the district court addressed anticipation based on the abstract, and concluded that there was no dispute that the tracer that is claimed in the patent was present in the K2 serum. In other words, the K2 sera contained the K2 antibody. No dispute about that. But then went on to talk about selective binding. But my question is, doesn't the claim talk about the selective binding of the antibody, not selective binding of the overall composition or the overall sera? It's the antibody. Well, it's interesting. What it actually claims is a composition. If you look at the language, it claims 17 and 21. In fact, if you look at the data, which is in the record, about what the anti-sera, the anti-sera bound significantly greater selectively, the anti-sera itself bound selectively to 1 to 10 and 2 to 10, 1 to 10 being one of the peptides of the invention, and much, much less to 4 to 37, which is what the district judge focused on. So again, the judge was forgetting that the claim says selectively binds. It doesn't say just binds. And what happened here is even the anti-sera itself selects for 1 to 10, is what the data shows in this patent. But also, the antibody, everybody knows that the final step in getting rid of the noise that surrounds an antibody in an anti-sera is to do immunity purification. It is a basic last step. But the selectively binding peptide is in the soup. Why isn't there anticipation? There is anticipation. It's there. It's inherent. It's absolutely there. It's there, and every person of skill in the art knows that it's there, and every person of skill in the art knows that the way you get it out in its best form, it will give you the best signal, is to do immunity purification, and now you have the antibody. And that's what the evidence is undisputed in this case. Well then why isn't there anticipation? There is absolutely anticipation. The abstract is the anticipating reference. It is the inventor's own work. It is their description of what they did. It is a fuller description of what they did than you find in the patent. The abstract is the anticipating reference pre-published by the inventors before the critical date. Now the only other thing I wanted to wrap up before I know I'm starting into my rebuttal time here is the jury verdicts are supported by substantial evidence here. We have the most fundamental error that a district court can make in ruling on those, and that is it substitutes its own assessment of the witnesses, its own assessment of the evidence, and it asks the wrong question. It asks, is there evidence that could support those? And then it concluded that there was, and therefore it was going to change it because the district court felt that was what it thought the outcome should be. It says it over and over again. The court says that, not when it describes the legal standard, but when it applies the legal standard. If you look at what the district court is doing, and there is great expert evidence here on enablement in best mode. I know written description is a difficult area, and I won't focus on that today, but certainly for enablement in best mode, there's way more than substantial evidence if you give deference to the jury's right to assess the witnesses and decide which experts they believe. Thank you. Thank you, Your Honor. We were talking about the abstract. It's a little bitty thing about this much, a hundred and some words. It doesn't even use the term K2. It refers to sera K1 to K3. The sera is obtained from rabbits. The record is clear that when you get sera from animals, it will vary with every rabbit you use. In fact, it did here. The evidence shows in the so-called MAPS paper that the K1 sera had one binding characteristic. K2 had another. K3 had yet a third. And yet they were all lumped together because they were made by immunizing rabbits the same way, and they got quite different results. So there's nothing inherent about immunizing a rabbit because it can come out different every time. Secondly, was there any dispute that the abstract disclosed the K2 sera? The abstract disclosed the K2 sera. I have a board here. I don't know that that's necessarily helpful. So there's no dispute that it discloses the K2 sera. I'm sorry. It mentions K2, and it doesn't disclose it because it doesn't say what its characteristics are. What it says is that K1-K3 show a predominant binding sequence at PTH 1-5. But the experts agree that predominant didn't mean that it wouldn't bind other places. And that's the key thing we're talking about here. And is there any debate that the K2 sera contained the K2 antibody? Well, I think we'd get into trouble if we used that loose nomenclature. Your Honor, I think when you say the K2 antibody, you mean the antibody which, after purification of the K2 sera, was the basis for the invention. Correct. The K2 antibody that Dr. Magerlein purified or obtained from the sera. It did, Your Honor. I may be using the wrong wording. You'll have to forgive me. And nobody would ever have known that was there, and nobody would ever have gone there to find that. But it's inherent. It's there. Your Honor, I think it's not inherent because nothing is disclosed. And I think the key case on that— Well, inherent anticipation always fails to disclose. But it is found necessarily present and therefore has the same effect as a disclosure. So, back to Judge Lynn's question, if it's present, if the binders are present in the soup, why isn't there anticipation? Because, Your Honor, there's no indication of what the important inherent characteristic is. In the metabolite case, the court said, when the reference is silent about the inherent characteristic, in this case, the antibody, such gap in the reference may be filled with recourse to the extrinsic evidence. Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference. And there is no such evidence in there. And furthermore— Why isn't it necessarily present? Because you're talking about antibodies, so if you immunize another rabbit, it might not be present. Is there any evidence in the record to suggest that it would not necessarily be present? Have you immunized another rabbit? In this record. Is there anything in this record to suggest that the antibody, the K2 antibody, would not necessarily be present in the K2 sera of this abstract? I think there is, Your Honor, because if you look at the maps in the dog papers, they showed that they had different characteristics based upon which rabbits they were obtained from, so that you would get different things. For the metabolite case— Well, I don't know. It seems to me that goes to the question of what preferential binding is exhibited by the sera, but the question is with respect to the particular antibody. And it seems to me that there is some testimony, some fairly compelling testimony from Dr. Magerlein that this antibody is present, inherently present, whether you realize it or not, whether you appreciate its characteristics or properties or not, it's inherently present in that serum. This is a compound claim. The antibody is in there. What more do we need to know? Your Honor, there is no description of the characteristics. Clearly, nothing is given to the public by this. The antibody doesn't— We've been over that before. It isn't a question of whether there is disclosure to the public. It's whether or not it was already in the public domain, whether the public understood it or not. We've made that quite clear in our case law that they don't even have to know about it. If the antibody was there in the prior art, as the abstract seems to suggest, what recourse does the court have other than to acknowledge that? Your Honor, first of all, there is nothing in here that makes a 102 rejection, in other words, of no public use of this material. It wasn't on sale. And in terms of a printed publication— But the law says you get a one-year grace period. They published it ahead of that. So, it's prior art. If it's prior art, it's in the public domain, the antibody is there, the antibody is the heart of this compound claim, I'm still struggling. What would be the problem? The problem is, Your Honor, that in a situation like this, there has to be something that puts the public in possession of this material. The abstract. The abstract doesn't do it because it doesn't tell a way— It doesn't have to tell. It simply has to exist. The prior art doesn't have to inform anyone of anything in order for there to be inherent anticipation. That's our case law. You've said nobody has to know that the inherent property is present in the prior art. If it is present, it's in the public domain, and that is sufficient for anticipation. Only, according to metabolite, Your Honor, only if it would have been recognized by a person of ordinary skill in the art. And clearly, it would not have been recognized by a person of ordinary skill in the art to meet the metabolite test. In fact, there's nothing here that makes any suggestion of properties of an antibody which would selectively bind. There's nothing in the description of the antibody in the abstract at all. There's no attempt to define the characteristics or even disclose individual antibodies. All it talks about is a mixture— It says, Sarah, K1 through K3 show a predominant binding sequence at HPTH 1 through 5. Right, and they also show a predominant binding sequence at 4 to 12. All we need is one. Pardon? I'm sorry, Your Honor. All we need is the one. No, you need both, Your Honor, because it doesn't meet the test of the claims that it selectively binds because it binds both to 4 to 12  and also to 1 to 5, then it does not meet the test of the claims because it does not selectively bind. And that's exactly the point. You don't have any sort of an inherent property. You don't have an inherent antibody. There's nothing that would suggest what's skilled in the art. What you have to do is apply a purification technique to get it. But 1 to 12 will connect at the same epitome as 1 to 6, so it'll work identically, right? Wrong, Your Honor. The antibody that binds 1 to 6 It's got the same epitome. It's got the same connecting regions. No, but the experts were pretty clear on that because if 4 to 12, the whole brilliance of this invention was that the antibody would not bind if the first two amino acids  And that was a characteristic of biologically active PTH. Serine and valine. Right, and 4 to 12 has the first two acids missing, so the antibody in its claims does not bind with 4 to 12. It only binds when the first two amino acids are present. We're talking 1 to 12. Pardon? We're talking 1 to 12. 1 to 12 is going to connect at the same place as 1 to 6, right? Yes, Your Honor, but They've got the same epitome. They're going to have to. What I'm telling you is it did not bind with 4 to 12 and therefore did not meet the limitations of the claim. Well, it did something in addition, but it satisfied the claim, right? No, it's an addition, Your Honor. It can do it. It doesn't satisfy the claim. Because you think selectively binds says that you only have material in that sera that connects to the that the sera has to be exclusively the detecting the biologically active material. Well, I think it has to meet the limitations of the claim as construed by the court, and so I think that's the key, Your Honor. The claim is talking about selective binding of the antibody, not selective binding of the sera or the bacteria. That's right. And my argument is the only thing we have disclosed in the abstract, we don't know what was in there from this thought. Well, we do know that from subsequent evidence after the critical date of the invention by the inventors. The inventors showed through his experiment that the antibody was present from what I gather there is nothing in the record to suggest that that would not be the case necessarily each and every time. Well, that, Your Honor, I think is shown by the evidence in the case to be not exactly right because even the three antibodies, the three anti-sera K1, K2, and K3 you don't know what you're going to get. You get different antibodies when you immunize goats, mice, whatever. So you don't know what you're going to get. There's no inherency in this because you don't get any kind of reproducibility even if you try to follow this with the rabbits. But the claim has nothing to do with rabbits. It has to do with a sequence, an amino acid sequence, a peptide. They're present. I think everyone acknowledges they're present. You're just saying they're present and there's more things in this, Sarah, than just the peptide that you've claimed. Well, that's right, Your Honor. And more importantly there's nothing in the abstract that will necessarily give you the same K2 anti-sera every time. When they took three rabbits, K1, K2, and K3, injected one to ten, they got different results every time they did it. And so the point is the abstract, it doesn't tell you which one of those anti-sera to use. It doesn't say K1, K2, K3. It doesn't say what the properties are. When the properties were tested several months later, they found that one of them had binding properties which were useful. But that's only for one antibody in the whole mess that they had to purify first. It was only obtainable when they were able to purify it. Let me say this, Your Honor. The jury found that the abstract did not make the invention obvious. And if the abstract doesn't make the invention obvious, it would seem that it also doesn't anticipate. The court has held that anticipation is the epitome of obviousness. We believe that the jury's verdict subsumes this argument. And there's no argument left after the jury found that the abstract doesn't make the invention obvious. It doesn't make it obvious. It certainly can't act as an anticipation. Thank you, Your Honor. Let's talk about the actual data. You'll find in the record at A. 2254 the actual binding data of the antiserum. And despite what counsel has said this morning, it shows remarkably similar binding profile for K1, K2, and K3. And that was also the evidence that the binding profile is essentially identical. It is necessarily present. The antibody is there. The only thing you need to do to get a selectively binding one is to purify, right? Correct, Your Honor. That's all you need to do. So it's present in the prior arc? It is definitely present in the prior arc. And even the antiserum, as I point out, you look at that data, it shows selective binding because it shows that it is binding dramatically higher with 1 to 10, which is of course one of the peptides claimed, than it is with this 4 to 37. So it's not, counsel said it was predominantly binding to 4 to 37 also? Of course not. The data just doesn't support that. Likewise, the argument that the abstract does not anticipate because the characteristics of the antibody are not described in the abstract, well then certainly we have no patent then because the only data one finds in this record is in the abstract. This patent is remarkably silent on any characteristics of this antibody. There is no data whatsoever showing where any of the characteristics are in the patent. There is not even indication that they even found any antibodies in the patent. So if this abstract is not anticipating, then there cannot possibly be a valid patent. And I just briefly like to mention of course, Your Honor's reference to your case law, the Shearing case, the Atlas Powder case, which of course points out that the fact that those of skill in the art don't appreciate all the properties of what is there is completely irrelevant as a matter of law. Thank you. Thank you very much. The case is submitted. All rise. The court has adjourned until tomorrow morning at 10 a.m. Thank you. Thank you. Thank you. Thank you. 3 3 3 3 3 3 3  3            2